IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MICHAEL G. OLIVERI, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. _____ |
| | § | |
| SHELL OIL COMPANY, | § | |
| | § | |
| Defendant | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Michael G. Oliveri ("Mr. Oliveri" or "Plaintiff"), files his Original Complaint against Shell Oil Company ("Shell," "the Company," or "Defendant"), showing as follows:

## SUMMARY

1.      This is a case of willful discrimination and retaliation under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq*. Mr. Oliveri is a decorated war veteran, Colonel in the U.S. Army Reserve, and a retired supervisor for the United States District Courts.

2.      In August 2015, Mr. Oliveri obtained a security related job with a contractor to Shell. In August 2016, Mr. Oliveri applied for an open job directly with Shell as its Security Advisor US. The position was within a group headed up by Crockett Oaks, Shell's Regional Security Manager – Americas for Shell. Mr. Oaks reported to James W.D. Hall, a British citizen working in the Company's Global Headquarters located in The Hague, Netherlands.

3.      The job Mr. Oliveri applied for was open as the result of an employee named Bob Schoen being reassigned to a position of greater authority. Mr. Schoen is in his fifties. Around the time Mr. Schoen was reassigned, Mr. Hall sent Mr. Oaks an e-mail stating, "[l]et's indeed look to backfill Bob's role with some **younger** external talent." (Ex. 1) (bold added). Mr. Hall also preferred a female to fill the opening, and he put that preference in writing too (Ex. 2 at 3).

4.    In September 2016, Mr. Oaks instead recommended that Mr. Oliveri – a male applicant over the age of 50 – be hired, because he was the best qualified applicant for the opening as determined by a group of individuals who vetted the applicants.  Mr. Hall objected to Mr. Oaks' recommendation, stating in an e-mail on September 14, 2016, that: (a) he had wanted someone "with the potential for a longer career in Shell"; and (b) wanted Mr. Oaks to "to look particularly at female candidates."  (Ex. 2 at p. 3).  Mr. Hall then spoke to Dana Croft, Shell Policy Team Lead Domestic – U.S. HR about Mr. Oaks' recommendation to hire an older male, and, according to an e-mail Ms. Croft's sent Mr. Oaks, Mr. Hall, "**mentioned his concerns (female talent and early career)**. . . ."  (Ex. 3) (bold added).

5.    Mr. Oaks refused to hire based on age and sex, and instead continued to recommend hiring the best qualified applicant for the job – Mr. Oliveri – who, as mentioned above, happened to be a male over 50 years old.  In other words, Mr. Oaks opposed Mr. Hall's illegal discriminatory desires for him to hire based on age and sex.

6.    In October 2016, Mr. Oliveri was offered, and accepted, the Security Advisor U.S. job.  This angered Mr. Hall.  And, just two months later, in early December 2016, Mr. Hall: (a) personally fired Mr. Oaks in retaliation for his legally protected oppositional conduct; and (b) then, based on age and/or sex, personally pulled the job offer that had been extended to Mr. Oliveri.

7.    After his termination, Mr. Oaks retained counsel and, over the next three months, he: (a) sent Shell a demand letter alleging retaliation; (b) filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging retaliation; and (c) filed suit against Shell alleging retaliation.  *See Crockett Oaks III v. Shell Oil Company*, Case No. 4:17-cv-00979, Docket Entry No. 1.  Mr. Hall and Mr. Oliveri figured prominently in the demand letter, the Charge, and the lawsuit.  This further upset Mr. Hall and made Mr. Oliveri *persona non grata*

within Shell. As such, although Shell purported to repost the Security Advisor U.S. position in early 2017, and to give Mr. Oliveri another chance to reapply and re-interview for it, in reality Shell had already decided that it would never hire Mr. Oliveri for the role because of his age, his sex, and in retaliation for his involvement with, and proximity to, Mr. Oaks and his repeated and ongoing protected activities against Shell. *See supra*.

8.      Sure enough, on April 24, 2017, Shell informed Mr. Oliveri that he would not be hired into the Security Advisor U.S. position this time either, and – to add insult to injury – it was cancelling his contract with the contracting company he worked for at the end of the year, so he would be totally unemployed.

9.      In sum: (a) Shell discriminated against Mr. Oliveri based on age and/or sex, when, in December 2016, it rescinded the job of Security Advisor U.S. that he was offered, and had accepted, in October 2016; (b) Shell illegally discriminated and retaliated against Mr. Oliveri when he was passed over for the Security Advisor U.S. job after it was reposted and he applied and interviewed for it again in 2017; and (c) Shell illegally discriminated and retaliated against Mr. Oliveri when it cancelled his contract with GS4, effective the end of 2017, thus rendering him unemployed at that time. Shell's conduct violates the ADEA's anti-discrimination and anti-retaliation provisions, 29 U.S.C. § 623(a) and (d). It also violates the anti-retaliation provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000*e et seq.*, and the Texas Commission on Human Rights Act ("TCHRA"), TEX. LAB. CODE ANN. § 21.001 *et seq*.

10.      Mr. Oliveri has exhausted his administrative remedies under the ADEA, but not Title VII or the TCHRA. Thus, he brings this suit only under the ADEA at this time. Once he has exhausted his administrative remedies under Title VII and the TCHRA, he will amend this lawsuit to assert claims under the anti-discrimination and anti-retaliation provisions of those two laws.

## THE PARTIES, JURISDICTION, AND VENUE

11.     The Plaintiff, Mr. Oliveri, is a natural person residing in The Woodlands, Texas. But for the illegal discrimination and retaliation, he would have been employed by Shell located at One Shell Plaza, 910 Louisiana Street, Houston, Texas 77002.  Mr. Oliveri has standing to file this lawsuit under the ADEA.

12.     Shell is headquartered at One Shell Plaza, 910 Louisiana Street, Houston, Texas 77002, is a citizen of Texas, and may be served with process through its registered agent, C T Corporation System, 350 N. St. Paul St., Suite 2900, Dallas, Texas 75201-4234.  During 2015, 2016, and 2017, Shell engaged in an industry affecting commerce and employed twenty or more employees for each working day in each of twenty or more calendar weeks.   In fact, during 2015, 2016, and 2017, Shell employed 501 or more employees for each working day in each of twenty or more calendar weeks.

13.     The Court has personal jurisdiction over Shell based on both general and specific jurisdiction.  Personal jurisdiction is proper because Shell has continuous and systematic contacts with and in the State of Texas, and the events or omissions giving rise to the Plaintiff's claims occurred in the State of Texas.

14.     Subject matter jurisdiction is proper because Mr. Oliveri brings claims for discrimination and retaliation under a federal law (the ADEA).

15.     Venue is proper in this Court because a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred in the Southern District of Texas, and the unlawful employment practices alleged in this case occurred in the Southern District of Texas.

## FACTUAL BACKGROUND

**A.** **In October 2016, Mr. Oliveri Was Offered A Job At Shell In Houston, But James W.D. Hall, Shell's Vice President Of Corporate Security In The Hague Was Unhappy About That, Because He Admittedly Wanted Someone Younger And Preferably A Female For The Job**

16. Mr. Oliveri retired after 24 years of distinguished service as a supervisor for the United States District Courts in Houston, Texas. Simultaneously, he serves as a Colonel in the United States Army both on active duty and as a reserve officer. He has served two combat tours in Afghanistan. His military awards include: 4 Meritorious Service Medals, a Defense Meritorious Service Medal, a Bronze Star Medal and the Legion of Merit.

17. In 2014, while he was still employed by the United States District Courts system, Mr. Oliveri applied for a job at Shell. Crockett Oaks, Regional Security Manager – Americas, was the hiring decision manager. At the time, Mr. Oaks was in the same Army Reserve Unit as Mr. Oliveri. Mr. Oaks declined to hire Mr. Oliveri because he believed another applicant was better qualified.

18. In August 2015, at the age of 52, Mr. Oliveri retired from government service as a GS-14. On August 31, 2015, Mr. Oliveri was hired by a Shell contractor, named G4S Secure Solutions in Houston ("G4S"). He was paid $80,000 a year with 10 days of leave and 7 holidays. He was hired as the Event Security Advisor, embedded in the corporate security office at Shell in Houston. Mr. Oliveri was well received by the Shell corporate security team members and was seen as a highly educated and trained professional in the field of security. He was told multiple times by multiple individuals employed by Shell that his work was far superior to those who had preceded him in the role, which had been in existence continually since 2006. Mr. Oliveri was also very favorably viewed by the Shell Production Center of Excellence team with whom he worked most closely in providing security guidance. In addition to the numerous tasks he

undertook as the event security advisor, he assisted with many other tasks in the corporate security office. He received many accolades from Shell surrounding his competence on work and projects assigned.

19. In his contract position, Mr. Oliveri reported to Mr. Oaks. That Mr. Oliveri and Mr. Oaks were both in the same Army Reserve Unit was well known, well publicized, and well documented within Shell, and was specifically disclosed to, and known by, Mr. Oaks' manager in The Hague, James W.D. Hall (Ex. 6); *see also Crockett Oaks III v. Shell Oil Company*, Case No. 4:17-cv-00979, Docket Entry No. 1 at ¶¶ 14, 18-20.

20. In August 2016, Shell posted an internal opening for Security Advisor U.S., which was a role previously occupied by Bob Schoen,[1] before he was reassigned to Country Security Manager, U.S. Mr. Oliveri applied for the opening, along with many other individuals. At the time of his application, Mr. Oliveri and Mr. Oaks had no reporting relationship with one another in the Army Reserve.

21. On August 26, 2016, Mr. Oliveri was informed by the hiring manager, Bob Schoen, that he would be given an interview for the position on August 29, 2017, at 1:00 p.m. Mr. Schoen told him that the interview would be before a panel consisting of himself, Mr. Oaks, and Pete Lininger, Downstream Security Manager Americas. The interview would be in two parts, a question and answer portion and a presentation. Mr. Schoen informed Mr. Oliveri that he needed to prepare a presentation on "regulatory requirements and the impact they have on physical security in the oil/gas and petrochemical industry."

---

[1] The job description for this particular role combined two other roles that were eliminated within the Corporate Security Americas - U.S. Team; Regulatory Assurance Manager and Security Manager – US.

22.     On August 29, 2016, Mr. Oliveri was interviewed by the three-member panel and shared his original presentation. On September 9, 2016, Mr. Oliveri was informed by Mr. Schoen and Mr. Oaks that he was recommended to Dana Croft, Shell Policy Team Lead Domestic – U.S. HR, as the preferred candidate for the position. Ms. Croft ratified the process that they followed and their ultimate decision that Mr. Oliveri was the best applicant for the position, and to recommend him to the ultimate decision-maker, James W.D. Hall, Vice President of Corporate Security, in Royal Dutch Shell plc's Global Headquarters located in The Hague, Netherlands.

23.     Mr. Hall resisted hiring Mr. Oliveri. Mr. Hall's problem with Mr. Oliveri was his age (Mr. Oliveri was 53 years-old) and his sex. Mr. Hall made no secret of that. On July 7, 2016, even before the position was formally posted, Mr. Hall sent Mr. Oaks an e-mail stating, "[l]et's indeed look to backfill Bob's role with some **younger** external talent." (Ex. 1) (bold added). Bob Schoen is in his 50s. Ms. Croft was copied on that e-mail (*Id*.). After Mr. Oaks let Mr. Hall know that he was recommending Mr. Oliveri for the position on September 9, 2016, Mr. Hall asked him how old Mr. Oliveri was, and Mr. Oaks told him that he was approximately 51-years old.

24.     Mr. Hall was frustrated and unhappy that Mr. Oaks had recommended someone older for the job despite his clear instructions on July 7, 2016, to "look to backfill Bob's role with some **younger** external talent." (Ex. 1) (bold added). Consequently, Mr. Hall e-mailed Mr. Oaks on September 14, 2016, at 9:29 a.m., objected to the hiring of Mr. Oliveri, and reminded Mr. Oaks he had let him know even before the position was posted that: (a) he had wanted someone "with the **potential for a longer career** in Shell"; and (b) wanted him to "to look particularly at **female** candidates." (Ex. 2 at page 3 (bold added)). Specifically, Mr. Hall wrote:

> Crockett,
>
> I must be honest, I still don't feel comfortable about this decision. The principle I apply is that my direct reports should be free to chose their own staff, provided they

take into account of steer I have provided in discussions about broader issues like diversity, talent management, career progression and succession planning.

In this case you consulted me about the CSM role. I agree to support Bob's [Schoen's] appointment so long as we took the opportunity to backfill for Bob by going to the market and **hiring someone with potential for a longer career** at Shell who could potentially move through a series of appointments and be future RSM material. **We have also discussed (in the context of other appointments) prioritizing the hiring of female staff.** The profile we discussed was ex-government agency, **still early in career** and (based on previous conversations) **you know I would want you to look particularly at female candidates**.

I have only seen the shortlist and your final recommendation. I have nothing against the individual, but I struggle to see how your proposed candidate brings fresh perspectives or diversity to your team. In short, I am concerned that we are guilty of a lack of imagination in looking for candidates and have opted for a safe option, at risk of failure to bring some fresh and different talent into Shell.

So before we go ahead, I would like to discuss our options with Dana and Klara. Can you set something up for us please? Friday is a good day for me if that works for others.

(Ex. 2 at pp. 2-3) (bold added).

25.     Mr. Oaks continued to support the recommendation to hire Mr. Oliveri, based on merit (Ex. 2 at pp. 1-2). In subsequent e-mails later that same day, September 14, 2016, Mr. Hall continued to suggest that Mr. Oliveri was too old and/or the wrong sex for the job (*Id*. at 1). For example, Mr. Hall wrote, in relevant part:

Mike may enable us to close today's gap. But we also need to consider whether we can use opportunities like this to hire and develop our future security leadership. On diversity, for different reasons, we have lost several women from our ranks over the last year or so and when we have an opportunity like this I would like to see what options we have to replace them.

(Ex. 2 at 1).

26.     Given Mr. Hall's reaction to the recommendation to hire Mr. Oliveri, Mr. Oaks was concerned about potential retaliation by Mr. Hall, so that same day he forwarded Mr. Hall's 9:29 a.m. e-mail to Dana Croft at 11:05 a.m. with a note, "<u>Confidential Do Not Forward</u>." (Ex. 3). Apparently, Mr. Hall had also communicated with Ms. Croft separately, and then Ms. Croft sent

Mr. Oaks an e-mail back at 11:15 a.m. that day in which she stated that Mr. Hall had e-mailed her and "**mentioned his concerns (female talent and early career[2])** . . . ." (Ex. 3) (bold added). Mr. Oaks was not copied on that e-mail from Mr. Hall to Ms. Croft. Shell, obviously, had an obligation to preserve it as evidence.

27.     Mr. Hall's discriminatory conduct and statements in these e-mails is not isolated. Rather, Mr. Hall said on numerous occasions that he wanted the Corporate Security Leadership Team to focus on hiring women and to think about succession – particularly focusing on younger workers – when hiring. Mr. Hall also said on numerous occasions that he wanted his managers to "identify young talent," within the organization, meaning talent that could hold a series of jobs in the security function over a number of years and ultimately become leaders in the department. Mr. Hall essentially admitted to these prior statements in his e-mail to Mr. Oaks of September 14, 2016, at 9:29 a.m., in which Mr. Hall referenced such prior discussions along those same lines and took Mr. Oaks to task for deviating from them in his recommendation to hire Mr. Oliveri (Ex. 2 at pp. 2-3). Consistent with his statements, Mr. Hall has facilitated putting in place younger individuals in the Corporate Security organization.

28.     On September 19, 2016, a teleconference was held with Mr. Oaks, Mr. Hall, Dana Croft, and Klara Smits (HR Account Manager for ER, ICNCS). During the call, Mr. Oaks told Mr. Hall that a criterion he wanted to use to screen applicants, age, could not be used in the U.S., because it was against the law. Mr. Oaks explained that a candidate's age was not even revealed on applications or resumes. Mr. Hall suggested that perhaps they could infer an applicant's age by other indicators, and then use that to screen. Ms. Croft then said that could not be done. At

---

[2] "Early career" was one way Mr. Hall expressed a preference for younger workers (e.g., those "early in their career" rather than later in their career). This is evident, for example, by comparing Mr. Halls own e-mails of July 7, 2016 and September 14, 2016, which use specifically the word "younger" and the phrase "early in career" to mean the same thing, *i.e.*, find a younger worker to backfill for Bob Schoen's old position (compare Ex. 1 to Ex. 2 at 3).

that point, Mr. Hall began stating that more females were needed in the Corporate Security Department, and, shortly thereafter, two external candidate females (Veronica Washington and Susan Pletz) were interviewed for the Security Advisor U.S. position.

29.     On September 27, 2016, Mr. Oaks and Mr. Hall were on a business trip in Trinidad and discussed the situation concerning the hiring of someone to fill the position of Security Advisor U.S.  By this point, all the individuals involved in the selection process had made it clear that in their judgment Mr. Oliveri was the best qualified applicant.  It was also made clear to Mr. Hall by Mr. Oaks that he was not going to simply go along with Mr. Hall's desire to hire someone for the position based on age (younger) and/or gender (female).  Accordingly, Mr. Hall publicly purported to relent from his previously announced illegal position, and sent an e-mail stating, "[A]ll, Crockett and I have discussed.  Support for the decision to proceed."  Yet, Mr. Hall remained upset and unhappy with Mr. Oaks – his subordinate had disobeyed him and called him out for his discriminatory hiring desires in front of others.

30.     During their conversation that day in Trinidad, Mr. Oaks expressly reminded Mr. Hall that both he and Mr. Oliveri were in the same U.S. Army Reserve Unit – something Mr. Hall had already long been well aware of[3] – and he used this as a basis to bolster his conclusion that Mr. Oliveri had the best qualifications, *i.e.* the right behaviors, work ethic, competence etc.  In response, Mr. Hall made an innuendo suggesting that unidentified people thought that Mr. Oaks was just "hiring his old Army buddy," *i.e.*, Mr. Oliveri.  Mr. Hall provided no support at all for the comment, and Mr. Oaks verbally refuted it so thoroughly – including accurately pointing out that he had declined to hire Mr. Oliveri when he had applied for a Shell role before when he did not

---

[3] *See, e.g.*, Ex. 6.

believe him to be the best qualified applicant – that Mr. Hall backed down from the contention, and agreed to approve the decision to hire Mr. Oliveri.

31. Mr. Oaks nevertheless remained troubled by Mr. Hall's comment about just "hiring his old Army buddy." Shell's Code of Conduct's "Conflicts of Interest" policy suggests filing a disclosure with the Code of Conduct Register if there is a perceived conflict, so as to "protect yourself from any suspicion of misconduct . . . ." In compliance with this provision, and to avoid even the possible appearance of impropriety, the next day, September 28, 2016, Mr. Oaks voluntarily, of his own initiative, formally filed a Conflict of Interest Disclosure with the Code of Conduct Register concerning his relationship with Mr. Oliveri, including an accurate description of their military service and military and social relationship just as he had told Mr. Hall the previous day (Ex. 4). That disclosure was routed, as a matter of course, to, among others, Mr. Hall. Mr. Hall made no mention to Mr. Oaks about it, presumably because, as noted above, he had long been well aware that Mr. Oaks and Mr. Oliveri both served in the Army Reserve Unit (Ex. 6). Mr. Oaks spoke with Mr. Hall and told him that he had declared the matter in the Company's Code of Conduct Register. To Mr. Oaks, it seemed that Mr. Hall was not very happy about that.

**B. Because Mr. Hall Admittedly Wanted To Hire Someone Younger, And Preferably Female, For The Job, He Had Mr. Oaks Fired On False Charges In December 2016, And Then Pulled Mr. Oliveri's Job Offer**

32. On October 3, 2016, Mr. Oliveri was given a formal written job offer for the Security Advisor U.S. position (Ex. 5). As reflected in the job offer, the position paid $114,000.00 per year, plus eligibility for a bonus of up to 15% of his base salary (*Id*.). Mr. Oliveri accepted the offer, and was scheduled to start in the job on November 1, 2016 (*Id*.). At this time, Mr. Oliveri was given Shell employee number 261514 and received access to the Shell internal portal where, until June 2017, he was able to access his Personal Summary Report, Current Compensation

Profile, and Individual Performance Review Outcomes for the job he was offered, and accepted, at Shell as Security Advisor U.S. Mr. Oliveri was, and remains, qualified for this job, and Shell has never claimed otherwise.

33. On October 27, 2016, Mr. Oliveri received an email from Shell's Human Resources department indicating that the hiring process for him had been put on hold pending an investigation. Almost simultaneously, he received an email from Jasper Smidtman, from Shell's Business Integrity Department in The Hague, Netherlands – the same location as Mr. Hall. Mr. Smidtman indicated in the email that he wanted to interview Mr. Oliveri on November 3, 2016.

34. Shell's policy provides that investigations "usually involve a suitability-trained investigator from the country to which the report refers, who has local expertise." Shell has a Business Integrity Department in the United States of America. But, instead of using one of those American investigators, or an American external consultant, Shell assigned Mr. Smidtman to the investigation, a non-American, who was not "suitably trained."

35. On November 3, 2016, Mr. Oliveri met with Jasper Smidtman in the Houston office. Based on the tone and aggressiveness of the interview, he quickly realized that Mr. Smidtman was attempting to find a conflict of interest with Crockett Oaks and their military reserve affiliation. It was obvious to Mr. Oliveri that Mr. Smidtman was not on a fact finding mission but instead was interviewing him to concoct a story to undo his hiring as the Security Advisor U.S. Others were interviewed as well by Mr. Smidtman including Crockett Oaks, Bob Schoen and Pete Lininger. They also indicated to Mr. Oliveri the same witch hunt tone from Mr. Smidtman, as opposed to an interview seeking to find facts and the truth. Mr. Oaks explained this in great detail in the sworn lawsuit he filed against Shell on March 30, 2017. *See Crockett Oaks III v. Shell Oil Company*, Case No. 4:17-cv-00979, Docket Entry No. 1 at ¶¶ 39-45.

36.     There was no conflict of interest – Mr. Oaks and Mr. Oliveri were not in any military reporting relationship at the time of Mr. Oliveri's application, interview, or hiring – and, in any event, as e-mails prove, Mr. Oaks had not hidden his military relationship with Mr. Oliveri from Shell (Ex. 6); *See also Crockett Oaks III v. Shell Oil Company*, Case No. 4:17-cv-00979, Docket Entry No. 1 at ¶¶ 39-45.  Nevertheless, during his interview of Mr. Oaks, Mr. Smidtman told Mr. Oaks, *inter alia,* that Mr. Hall had asserted that he had no knowledge that both Mr. Oaks and Mr. Oliveri were in the same U.S. Army Reserve Unit or that they had known each other for several years (Ex. 6 at page 1).  This, of course, is totally false, and Mr. Oaks let him know that both verbally and by providing written proof to completely refute Mr. Hall's allegations (*Id*.).  During the interview, Mr. Oaks, feeling very uncomfortable, expressly told Mr. Smidtman that he believed Mr. Hall was retaliating against him because he had refused to accede to his desire to hire a younger and/or female applicant for the position of Security Advisor U.S.  *See Crockett Oaks III v. Shell Oil Company*, Case No. 4:17-cv-00979, Docket Entry No. 1 at ¶ 40.  In response, Mr. Smidtman did nothing (*Id*.).

37.     On December 6, 2016, Mr. Oaks was fired by Mr. Hall.  Mr. Hall told Mr. Oaks that he had committed an actual conflict of interest involving the military affiliation between himself and Mr. Oliveri, and failed to report it.  That is totally false.  *See Crockett Oaks III v. Shell Oil Company*, Case No. 4:17-cv-00979, Docket Entry No. 1 at ¶¶ 74-75.  Until that point, Mr. Oaks had never been disciplined once in his 13-year career with Shell, had received uniformly positive reviews and numerous promotions, and was deemed promotable to an executive level position by Shell.  The fact is, Mr. Hall retaliated against Mr. Oaks for not following his discriminatory desire to hire based on age and sex, and that is why Mr. Oaks was fired.  Shell

offered Mr. Oaks a severance, release, and confidentiality agreement, in hopes he would sign it and, as a result, Mr. Hall's discrimination would never come to light.

38. With Mr. Oaks gone, Mr. Hall turned his attention to torpedoing Mr. Oliveri, who he never wanted for the Security Advisor US job in the first place, because of his age and sex. Three days later, on December 9, 2016, Mr. Hall informed Mr. Oliveri that he would not receive the Security Advisor U.S. position for which he had been hired. Mr. Hall said Shell would repost the position, and he could re-apply. At the time, Mr. Hall did not offer any explanation to Mr. Oliveri as to why any of this had occurred. Mr. Hall did not claim that Mr. Oliveri was not qualified for the Security Advisor U.S. position.

39. On December 13, 2016, Mr. Oliveri received an e-mail from Mike Dixon, Supervisor for G4S, indicating that Shell insisted that Mr. Oliveri change the signature block on his e-mail account from Shell Oil Co. to G4S Secure Solutions. Mr. Oliveri had used Shell Oil in his signature block since he started in his role at Shell, and Shell was well aware of that. Additionally, the previous G4S contractor who held this position used Shell Oil Co. in his signature block. At this time, Mr. Oliveri was also directed to no longer use his Shell business cards, which had been provided and paid for by Shell, and was given replacement business cards with the G4S logo.

40. On December 16, 2016, while Mr. Oliveri was participating in a global teleconference with Shell's corporate security members, Mr. Hall told the group of the need, and his desire, to hire females in the corporate security department.

**C.  Shell Reposted The Job Mr. Hall Had Just Pulled From Mr. Oliveri, And Invited Him To Reapply, As A Pretext To Cover Up The Fact That It Would Never Give Him The Job Because Of Age And Sex Discrimination, And Retaliation**

41. Mr. Oaks did not sign the severance, release, and confidentiality agreement Shell offered him when it fired him. Instead, on December 22, 2016, Mr. Oaks, through his legal

counsel, sent Shell a lengthy letter, accusing the Company – and particularly Mr. Hall – of retaliating against him because he opposed Mr. Hall's discriminatory desires to hire based on age and sex. In that lengthy letter, Mr. Hall's victim, Mr. Oliveri, was mentioned repeatedly. No doubt, this upset Mr. Hall, who had hoped that Mr. Oaks was going to sign the severance, release, and confidentiality agreement he had been offered.

42. On January 13, 2017, Mr. Oliveri sent an e-mail to Shell's Human Resources department seeking clarification on the outcome of the investigation and more information as to why he was not hired for the Security Advisor U.S. position. In response to that e-mail, James W.D. Hall and Andrew Maynor, Shell's HR Account Manager had a teleconference with Mr. Oliveri. Mr. Hall stated that they found integrity issues in the hiring process. However, both Mr. Hall and Mr. Maynor told Mr. Oliveri that he had done nothing wrong. In addition, neither Mr. Hall or Mr. Maynor asserted that Mr. Oliveri was not qualified for the Security Advisor U.S. position. During the conversation, Mr. Hall indicated, as he had in December 2016, that the job offer would be officially rescinded by Human Resources but that he could repost for the position. This "reposting" was a sham designed to whitewash Mr. Hall's discrimination against Mr. Oliveri based on his age and/or sex. There was not way that Mr. Hall was going to allow Mr. Oliveri to be hired for the Security Advisor U.S. position. He did not want him to begin with, because of his age and sex (Exs. 1-3).

43. On January 16, 2017, Mr. Oliveri received an email from Kathy Long, a recruiter with Shell's Human Resources department, indicating the job offer to him had been rescinded. On January 17, 2017, a new job posting appeared for the Security Advisor U.S. position, with a closing date of January 31, 2017.

44.     On January 27, 2017, Mr. Oaks filed a Charge of Discrimination with the EEOC that included several exhibits to it, including the aforementioned December 22, 2016, letter to Shell from Mr. Oaks' counsel (Ex. 7). That same day, at 1:00 p.m., Mr. Oaks' legal counsel e-mailed a file-stamped copy of the EEOC Charge, with its exhibits, to Shell's in-house lawyer, John Parsons.

45.     On February 9, 2017, Mr. Oaks and Shell went to mediation with a private mediator. Mr. Oaks' case did not settle. Six days later, on February 15, 2017, Mr. Oliveri received a telephone call from Kathy Long indicating they wanted to schedule an interview on February 21, 2017, for the Security Advisor U.S. position. From this and other evidence, is is clear that Shell was connecting Mr. Oaks' EEOC Charge and threatened litigation with Mr. Oliveri. Indeed, the two are connected, because Shell fired Mr. Oaks' in retaliation for opposing Mr. Hall's illegal discrimination against Mr. Oliveri (Exs. 1-3).

46.     During the telephone call with Mr. Long, she indicated that the interview process was different this time and there would be no presentation portion. Mr. Oliveri thought this was odd. The presentation segment was the portion of the first interview process that Thomas Hutt, an applicant for the Security Advisor U.S. position, and current Shell employee, under-performed and, ultimately, skewed his rating matrix, which was one of the main reasons which led to him not being offered the Security Advisor U.S. position. It was also a segment of the interview Mr. Oliveri had performed very well in. Ms. Long acted extremely apologetic to Mr. Oliveri for having to go through the process again and stated that "Shell does not typically operate like this."

47.     On February 21, 2017, Mr. Oliveri interviewed for the Security Advisor U.S. position (again). In the room were Bob Schoen, Andrew Maynor, and Kathy Long (who was there the second hour). On the telephone was Dan Jones, a Shell Corporate Security member from Europe. The interview was part of the contrived sham designed to whitewash Mr. Hall's illegal

discrimination against Mr. Oliveri. After the interview, more than two months went by and Mr. Oliveri heard nothing about the interview or the position.

48. On March 30, 2017, Mr. Oaks filed suit against Shell in federal court in Houston, Texas, under case number 4:17-cv-00979. *See Crockett Oaks III v. Shell Oil Company*, Case No. 4:17-cv-00979, Docket Entry No. 1. Approximately two weeks later, Mr. Oaks' case against Shell was dismissed by agreement of the parties on April 11, 2017. *See Crockett Oaks III v. Shell Oil Company*, Case No. 4:17-cv-00979, Docket Entry No. 6.

49. On April 23, 2017, eight weeks after his second interview, Mr. Oliveri sent an e-mail to James Hall, Bob Schoen, Kathy Long and Andrew Maynor indicating it had been two months since the interview and requested a status update on the process.

50. The next day, April 24, 2017, Mr. Oliveri was invited to meet with Andrew Maynor and Bob Schoen. Mr. Oliveri was advised that the job was given to Thomas Hutt, a candidate he had beat out for the job the first time the job was posted. Mr. Schoen then stated that Mr. Oliveri's current job contract would be honored until the end of the year, and after that it would come to an end. In other words, Mr. Oliveri did not get the Security Advisor U.S. job, and his own job was going to be terminated at the end of the year, so that he would be rendered unemployed. So Shell and Mr. Hall got what they wanted after all – Mr. Oaks was fired, and, in the end, Mr. Oliveri was not hired into the Security Advisor U.S. role.

51. Mr. Oliveri was shocked. The event Security Advisor position he holds through G4S has been in existence since 2006 – more than a decade. There was no indication prior to the discrimination and retaliation by Mr. Hall and Shell that the contract was not long-term. Had Mr. Oliveri not been caught up in the middle of illegal discrimination and retaliation, there is no doubt the G4S contract he had been working under would have continued indefinitely. Thus, the

"generosity" of Shell in allowing Mr. Oliveri to stay in the G4S position through December 2017 is actually retaliatory, as he otherwise would have had the G4S position for many years based on the feedback and reviews he had received.

52. Later on April 24, 2017, Mr. Oliveri filed his own EEOC Charge, alleging age discrimination, sex discrimination, and retaliation (Ex. 8). Three days later, on April 27, 2017, Mr. Oliveri received an e-mail from Shell stating "[u]nfortunately, the vacancy U.S. Security Advisor (Houston, TX) has been withdrawn…" (Ex. 9). This appears to be another attempt at deception and cover up by Shell as the position was not really "withdrawn," but instead given to Thomas Hutt. Mr. Oliveri currently continues to work in his contractor position with GS4 which, as mentioned, will end at the end of this year.

53. A few days later, Mike Dixon, Supervisor for G4S, told Mr. Oliveri that he was surprised to hear that Mr. Schoen had told him that his contract was ending at the end of 2017, because the contract G4S has with Shell for the position of Event Security Advisor ran through June 2018.

54. Shell had many opportunities to intervene in this matter and correct the illegal and wrongful actions of James W.D. Hall, that were in violation of Shell's Code of Conduct and the laws of the United States. Instead, Shell leadership at the highest levels of the Company chose to rally behind the discriminatory actions of Mr. Hall, and erect a facade designed to try to cover up Mr. Hall's illegal discrimination.

55. For example, on November 3, 2016, evidence of illegal discrimination came to light during investigative interviews held by Jasper Smidtman, Investigator, Shell Business Integrity Department. It appears that Smidtman chose to downplay this evidence, as it did not fit the narrative of the fabricated story about a conflict of interest between two honorable senior military

officers.  Alison McNeil, Smidtman's boss and head of the Business Integrity Department, had knowledge of the evidence of illegal discrimination.  It appears McNeil choose not to take action.  Scott Ballard, Executive Vice President, Shell Human Resources, Houston, Texas was aware of the evidence of illegal discrimination and it appears he chose not to take action.  Leanne Geale, Shell's Ethics and Compliance Department, Houston, Texas also had an opportunity to intervene at the appropriate time.  She did nothing.  Bruce Culpepper, County Chair and President - U.S. is responsible to ensure that Shell's Code of Conduct is upheld.  Culpepper presumably had a full understanding of the many violations but apparently lacked the intestinal fortitude to put a stop to James W.D. Hall's lies, deceit and discriminatory actions.  Finally, upon information and belief, James W.D. Hall's boss, Ronan Cassidy, Shell's Chief Human Resources and Corporate Officer, having full knowledge of all the events, allowed the illegal discrimination against Mr. Oliveri without any remediation.

56.     These senior individuals are charged with the responsibility of upholding and enforcing Shell's Code of Conduct by setting the course and tone and setting the example for the company.  It appears however, that none of these aforementioned individuals saw fit to correct the course that James W.D. Hall set.  In fact, as proven by is own e-mails (Exs. 1-3), James W.D. Hall clearly violated Shell's Code of Conduct provision the purports to prohibit illegal discrimination.  Yet James W.D. Hall still has a job with Shell.  The collusion by senior leadership at Shell, and conduct designed to cover up James W.D. Hall's illegal discrimination, indicates a systemic pattern of illegal discrimination, and is counter to what Shell espouses publically when people are watching.

57.     On April 20, 2017, Bruce Culpepper sent an email to "ALL EMPLOYEES & NON EMPLOYEES IN THE WORKPLACE", which states in part, "Shell recognizes the importance of

diversity and inclusion in creating a work environment that leverages our differences…This includes more visible differences such as gender, race, or ethnicity, and less visible differences such as religion, or beliefs…" This message was sent just 4-days before Mr. Oliveri was denied employment at Shell (for a second time) based on his and in violation of the laws prohibiting illegal discrimination and retaliation. Culpepper's email is nothing but hollow and hypocritical words designed to disguise the unhealthy culture of illegal discrimination and retaliation at Shell.

58. On May 31, 2017, Shell submitted its Position Statement to the EEOC. IT was written by Andrew Maynor, Shell's HR Account Manager, who assisted Mr. Hall in the cover up. *See supra*. Not surprisingly, in its Position Statement, Shell continued its attempted cover up. Shell tellingly mentioned not one word about the e-mails that prove illegal discrimination on their face (Exs. 1-3). Shell loudly proclaimed that its Code of Conduct and EEO policies against illegal discrimination are "core values," and that "[a]nyone who chooses not to follow them is making a choice not to work at Shell." This statement is laughable. It is crystal clear that Mr. Hall chose not to follow the Code of Conduct and EEO policies, as is proven by his own e-mails (Exs. 1-3). Yet, he still has a high-ranking job at Shell, and is earning a lucrative salary and generous benefits. And, on top of all that, Mr. Maynor and many others at Shell have supported Mr. Hall every step of the way, as he marched forward with his plan to fire Mr. Oaks for refusing to follow his discriminatory desires to hire for the Security Advisor U.S. position based on age and sex, and then made sure that Mr. Oliveri did not get that job. In doing so, Shell continues to sully Mr. Oliveri's reputation in an effort to evade its clear liability and save its own reputation.

59. Because of Shell's illegal discrimination and retaliation against him, Mr. Oliveri's character, reputation, and integrity have been impugned. This, in turn, obviously makes it far more

difficult for him to obtain a substantially comparable job in the close knit corporate security industry in Houston, Texas.

## DISCRIMINATION AND RETALIATION CLAIMS UNDER THE ADEA

**A.** **Law**

### 1. Discrimination

60. The ADEA was designed to "promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; [and] to help employers and workers find ways of meeting problems arising from the impact of age on employment." 29 U.S.C. § 621(b). Under the ADEA, "[i]t shall be unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

61. "A plaintiff can demonstrate age discrimination through direct evidence or by an indirect or inferential [circumstantial] method of proof." *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 309 (5th Cir. 2004). To qualify as direct evidence of age discrimination, a statement must be: (1) age related; (2) proximate in time to the termination; (3) made by an individual with authority over the termination; and (4) related to the employment decision. *See Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 576 (5th Cir. 2003).

62. The circumstantial model is governed by the well-known burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the circumstantial model, to establish a *prima facie* case of age discrimination based on circumstantial evidence, "a plaintiff must show that (1) he was discharged; (2) he was qualified for the position; (3) he was within the protected class at the time of discharge; and (4) he was either i) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) otherwise discharged because

of his age." *Rachid*, 376 F.3d at 309 (internal quotations and citations omitted); *Palasota*, 342 F.3d at 575-76. The burden to establish a *prima facie* case of age discrimination is not an "onerous" one. *See Reed v. Neopost USA, Inc.*, 701 F.3d 434, 439 (5th Cir. 2012). Under this framework, "a plaintiff is entitled to a 'presumption of discrimination' if he can meet the minimal initial burden' of establishing a *prima facie* case." *Id*.

63. If the plaintiff makes out a *prima facie* case, the burden of production then shifts to the defendant to proffer a legitimate, nondiscriminatory reason for the challenged employment action. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507 (1993); *Willis v. Coca Cola Enters., Inc.*, 445 F.3d 413, 420 (5th Cir. 2006). If the defendant meets its burden, the presumption raised by the plaintiff's *prima facie* case disappears. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255 n. 10 (1981). The plaintiff is then given the opportunity to demonstrate that the defendant's articulated rationale was merely a pretext for discrimination. *See Hicks*, 509 U.S. at 507-08; *Burdine*, 450 U.S. at 253; *Machinchick v. PB Power, Inc.*, 398 F.3d 345 (5th Cir. 2005).

64. Regarding the standard of causation, ultimately, under the ADEA, the burden falls to the employee to produce evidence that "but for" his age, he would not have been terminated. *See Gross v. FBL Servs. Inc.*, 129 S. Ct. 2343, 2352 (2009) (holding by the U.S. Supreme Court that the ADEA requires "but for" causation).

### 2. Retaliation

65. The ADEA's anti-retaliation provision prohibits an employer from discriminating against an employee for opposing an unlawful practice or asserting a charge, testifying, assisting, or participating in an ADEA proceeding or investigation. 29 U.S.C. § 623(d). "The analytical framework for a retaliation claim is the same as that used in the employment discrimination context." *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001).

66.     The well-known *McDonnell Douglas/Burdine* evidentiary framework applies to ADEA, Title VII, and TCHRA retaliation claims brought under a pretext theory. *See Septimus v. University of Houston*, 399 F.3d 601, 607 (5th Cir. 2005). Under that evidentiary framework, a plaintiff must first establish a *prima facie* case of retaliation. *See Baker v. American Airlines, Inc.,* 430 F.3d 750, 754 (5th Cir. 2005); *Haynes v. Pennzoil Co.*, 207 F.3d 296, 299 (5th Cir. 2000). To establish a *prima facie* retaliation case, a plaintiff must show that "(1) he engaged in protected activity; (2) he suffered an adverse employment decision; and (3) a causal link exists between the protected activity and the adverse employment decision." *Id*. The same elements for a *prima facie* retaliation case apply under Title VII and the TCHRA. *See Banks v. East Baton Rouge Parish School Bd.*, 320 F.3d 570, 575 (5th Cir. 2003); *Zaffuto v. City of Hammond*, 308 F.3d 485, 492 (5th Cir. 2002).

67.     If the plaintiff makes out a *prima facie* case of retaliation, then the defendant must articulate a legitimate non-retaliatory reason for the adverse employment decision. *See Baker,* 430 F.3d at 754-55. After the employer does so, "any presumption of retaliation drops from the case" and the burden shifts back to the employee to establish that the employer's "stated reason is actually a pretext for retaliation." *Baker*, 430 F.3d at 755 (quoting *Septimus*, 399 F.3d at 610-11); *Pineda v. United Parcel Service, Inc.*, 360 F.3d 483, 487 (5th Cir. 2004).

68.     Third-party retaliation is also prohibited by the ADEA. In *Thompson v. North American Stainless, LP*, 562 U.S. 170, 131 S. Ct. 863 (2011), the U.S. Supreme Court addressed a retaliation claim under Title VII of the Civil Rights Act. Eric Thompson, the plaintiff, was engaged to be married to Miriam Regalado and both were employed at North American Stainless ("NAS"). *Id*. at 867. Ms. Regalado filed an EEOC charge alleging sex discrimination against NAS, and three weeks later NAS fired her fiancée, Mr. Thompson. Mr. Thompson filed an EEOC

charge, and then sued NAS, contending that NAS fired him to retaliate against Ms. Regalado for filing her EEOC charge. *Id*. The United States Supreme Court first concluded that Mr. Thompson's status as Ms. Regalado's fiancée was a relationship close enough to potentially fit within Title VII's prohibition against third party retaliation. *Id*. at 868–69. Second, the *Thompson* Court concluded that Mr. Thompson was a "person aggrieved" within the meaning of Title VII because he was employed by the same employer as the original EEOC claimant and injuring him was the employer's intended means of harming the claimant; in the Court's phrase, Mr. Thompson was within the "zone of interests" sought to be protected by Title VII. *Id*. at 870.

69. In *Dembin v. LVI Services, Inc*., 822 F. Supp. 2d 436, 438-39 (S.D.N.Y. 2011), the district court held that *Thompson* applies to retaliation claims brought under the ADEA. This is not surprising, because the ADEA's anti-retaliation provision is related to the anti-retaliation provision of Title VII, and cases interpreting the latter provision are frequently relied upon in interpreting the former. *See Passer v. American Chemical Society*, 935 F.2d 322, 330 (D.C. Cir. 1991) (citations omitted); *Merrick v. Farmers Ins. Group,* 892 F.2d 1434, 1441 (9th Cir. 1990) ("Those circuits that have considered ADEA retaliation claims have generally adopted the analysis used in Title VII cases without comment.") (*citing Powell v. Rockwell Int'l Corp*., 788 F.2d 279, 284-85 (5th Cir. 1986)) (other citations omitted).

**B.    Analysis**

### 1.    Discrimination Claims

70. Mr. Oliveri wins his age discrimination claim under the direct evidence model of proof. He did not get the Security Advisor U.S. job because, as Mr. Hall stated in an e-mail, he wanted to fill the role with some "**younger** external talent." (Ex. 1). That is direct evidence of age discrimination that is especially probative because Mr. Hall repeated his desire for a younger candidate numerous times in writing (Exs. 1-3).

71.     Alternatively, Mr. Oliveri prevails under the circumstantial model.  He easily makes out a *prima facie* case of age discrimination.  He is 53-years old, qualified for the Security Advisor U.S. job (indeed, it was actually awarded to him in October 2016 after a competitive application and interviewing process), and he was either passed over for the job in favor of a younger candidate, or can otherwise demonstrate that he was discriminated against based on age. This is not difficult for Mr. Oliveri to do in light of Mr. Hall's e-mails, in which he repeatedly explicitly expressed a desire for a younger candidate than Mr. Oliveri (Exs. 1-3).  As Mr. Hall flat-out admitted, he wanted to fill the role with some "**younger** external talent."  (Ex. 1).

72.     In *Goudeau v. National Oilwell Varco, L.P.*, the U.S. Court of Appeals for the Fifth Circuit addressed less compelling age related remarks in age-based discrimination claims, and held that such remarks are probative of age discrimination under the circumstantial model so long as they were made by a decisionmaker and were age related – both of which are the case here. 793 F.3d 470 (5th Cir. 2015).  *See also Jackson v. Host Intern., Inc.*, Nos. 09–51137, 10–50026, 2011 WL 2119644, at *3 (5th Cir. Feb. 1, 2011) (age-based remarks supported plaintiff's verdict under the TCHRA); *Machinchick*, 398 F.3d 345, 353-54 (relying on age-based remarks in reversing a summary judgment granted for the employer in an age discrimination case); *Palasota*, 342 F.3d at 576 ("After *Reeves,* however, so long as remarks are not the only evidence of pretext, they are probative of discriminatory intent."); *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226 (5th Cir. 2000) (age-based remarks supported jury's verdict in plaintiff's favor in an age discrimination case).  Moreover, that the comments were made by Mr. Hall – the top executive in Shell's entire Corporate Security organization – makes them especially strong evidence of age discrimination. *See, e.g.*, *Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128, 132 (3d Cir. 1997) (comments made by top executives may be offered to prove culture of discrimination).

73.     Shell claimed it rescinded Mr. Oliveri's original job offer that he had already accepted because of integrity issues in the hiring process. That is what Mr. Hall told Mr. Oliveri on January 13, 2017. *See supra*. That is a false pretext. There were no integrity issues in the hiring process, and Mr. Hall knew that. Mr. Oaks established this at length in his sworn lawsuit. *See Crockett Oaks III v. Shell Oil Company*, Case No. 4:17-cv-00979, Docket Entry No. 1 at ¶¶ 11-51. That is simply a false pretext for discrimination. Hence, Mr. Oliveri prevails on his claim that the Security Advisor U.S. position was rescinded based on his age.

74.     Shell articulated, no non-discriminatory reasons for refusing to hire Mr. Oliveri into the Security Advisor U.S. role in 2017 (after he applied and interviewed for it the second time), or for canceling his contract at the end of the year even though that position had existed since 2006. That Mr. Oliveri was – as proven by his selection over Mr. Hutt the first time the job was posted – the best candidate, by far, further establishes his case. *See Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 412 n. 11 (5th Cir. 2007) ("[A] showing that a plaintiff is 'clearly better qualified' is one way of demonstrating . . . pretext"); *Davis v. AMPCO Sys. Parking*, 748 F. Supp. 2d 683, 698-99 (S.D. Tex. 2010) (genuine issue of material fact existed as to whether plaintiff was clearly better qualified precluded summary judgment for employer on Title VII discrimination claim).

75.     Other evidence further supports Mr. Oliveri's claim here. For example, in the second interview process in 2017, the presentation portion was not included. The presentation segment was the portion of the first interview process that Thomas Hutt under-performed and, ultimately, skewed his rating matrix, which was one of the main reasons which led to him not being offered the Security Advisor U.S. position. Shell excluded that portion the second time

around to slant the process to the result that was predetermined by then: that Mr. Oliveri would, as Mr. Hall had insisted from the start, not be hired for the job, because of his age (Exs. 1-3).

**2.      Retaliation Claims**

76.      Mr. Oliveri can make out a *prima facie* case of retaliation.  First, under *Thompson*, he can claim retaliation for Mr. Oaks' multiple legally protected activities – his refusal to submit to Mr. Hall's discriminatory demands to hire based on age and sex in September 2016, his demand letter of December 22, 2016, his EEOC Charge of January 27, 2017, and his lawsuit of March 30, 2017 – because he is within the "zone of interests" sought to be protected by the ADEA.  Indeed, as the victim (Exs. 1-3), Mr. Oliveri was at the center of all of these protected activities by Mr. Oaks.  *See supra*.

77.      Second, Mr. Oliveri suffered adverse employment actions.  Specifically: (a) the job of Security Advisor U.S. that he was offered and accepted in October 2016, was rescinded by Mr. Hall in December 2016; (b) he was passed over for the job after he was reposted and he applied and interviewed for it again in 2017; and (c) Shell cancelled his contract with GS4, effective the end of 2017, thus rendering him unemployed at that time.

78.      Third, there is a causal link between Mr. Oaks' protected activities, and the adverse employment actions Mr. Oliveri has suffered.  The link is direct – for example, it is abundantly clear from the evidence that in early December 2016, Mr. Hall fired Mr. Oaks, *and also rescinded the job offer to Mr. Oliveri*, because of Mr. Oaks' protected activities – namely, his refusal to accede to his discriminatory desire for Mr. Oaks to hire based on age and sex.  *See supra* and *see also Crockett Oaks III v. Shell Oil Company*, Case No. 4:17-cv-00979, Docket Entry No. 1 at ¶¶ 11-51.

79.      Similarly, the close and overlapping timing between Mr. Oaks' protected activities in late 2016, and early 2017, and the adverse employment actions against Mr. Oliveri during those

same time periods, also establishes the causal link between the two. *See Heggemeier v. Caldwell Cty.*, 826 F.3d 861, 870 (5th Cir. 2016) ("Close timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a *prima facie* case of retaliation.") (quoting *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997) (emphasis omitted)); *see also Cantu v. Vitol, Inc.*, Civil Action No. H-09-0576, 2011 WL 486289, at *10 (S.D. Tex. Feb. 7, 2011) (Rosenthal, J.) (noting that "the Fifth Circuit has found temporal proximity of up to four months sufficient to show a causal link."); *Richard v. Cingular Wireless LLC*, 233 Fed. Appx. 334, 338 (5th Cir. Apr. 13, 2007) (concluding that two-and-one-half months is short enough to support an inference of a causal link); *Evans v. City of Houston*, 246 F.3d 344, 355 (5th Cir. 2001) (observing that "a time lapse of up to four months has been found sufficient to satisfy the causal connection for summary judgment purposes") (internal citations omitted).

80.     Finally, that Shell did not follow its normal processes or policies is also probative of a causal link. *See Nowlin v. Resolution Trust Corp.*, 33 F.3d 498, 508 (5th Cir. 1994). Shell's alleged normal policy is not to hire based on sex or age, but that is exactly what Mr. Hall insisted on here (Exs. 1-3). Shell's normal policy is to use a local Business Integrity Department investigator, but that is not what it did here – preferring instead to use one from Mr. Hall's same work location in The Hague who lacked appropriate experience and knowledge. Shell's normal policy is to go through one round of interviews and award the job to the best candidate, but here it went through that process twice – the second time after already having awarded the at-issue job to Mr. Oliveri. As Kathy Long told Mr. Oliveri on February 15, 2017, "Shell does not typically operate like this." Thus, Shell itself admitted that it did not follow its normal policies and procedures in this case.

81.     Shell claimed it rescinded Mr. Oliveri's original job offer that he had already accepted because of integrity issues in the hiring process.  That is what Mr. Hall told Mr. Oliveri on January 13, 2017. *See supra*.  That is a false pretext.  There were no integrity issues in the hiring process, and Mr. Hall knew that.  *Crockett Oaks III v. Shell Oil Company*, Case No. 4:17-cv-00979, Docket Entry No. 1 at ¶¶ 11-51.  That is simply a false pretext for retaliation based on Mr. Oaks having refused to submit to Mr. Hall's discriminatory desires to hire based on age and sex.

82.     Shell articulated no non-retaliatory reasons for refusing to hire Mr. Oliveri into the Security Advisor U.S. role in 2017 (after he applied and interviewed for it the second time), or for canceling his contract at the end of the year even though his position had existed since 2006.  That Mr. Oliveri was – as proven by his selection over Mr. Hutt the first time the job was posted – the best candidate, by far, further establishes his case.  *See Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 412 n. 11 (5th Cir. 2007) ("[A] showing that a plaintiff is 'clearly better qualified' is one way of demonstrating . . . pretext"); *Davis v. AMPCO Sys. Parking*, 748 F. Supp. 2d 683, 698-99 (S.D. Tex. 2010) (genuine issue of material fact existed as to whether plaintiff was clearly better qualified precluded summary judgment for employer on Title VII discrimination claim).

83.     Other evidence further supports Mr. Oliveri's claim here.  For example, in the second interview process in 2017, the presentation portion was not included.  The presentation segment was the portion of the first interview process that Thomas Hutt under-performed and, ultimately, skewed his rating matrix, which was one of the main reasons which led to him not being offered the Security Advisor U.S. position.  Shell excluded that portion the second time around to slant the process to the result that was predetermined by then: that Mr. Oliveri would, as Mr. Hall had insisted from the start, not be hired for the job, because of Mr. Oaks' pestering

protected activities that had been a thorn in his side since he personally fired Mr. Oaks in December 2016 (Exs. 1-3).

**C.      Damages**

84.     The damages under the ADEA consist of back-pay, front-pay (or reinstatement), liquidated damages, attorneys' fees, and costs.  Each component is explained below.

85.     <u>Back-pay</u>.  Prevailing claimants under the ADEA may recover lost back-pay and benefits.  *See Miller*, 716 F.3d at 146.  The purpose of back pay is to "make whole the injured party by placing that individual in the position he or she would have been in but for the discrimination." *Sellers v. Delgado Cmty. Coll.*, 839 F.2d 1132, 1136 (5th Cir. 1988).

86.     <u>Front-pay</u>.  "Front pay refers to future lost earnings." *Wal-Mart Stores v. Davis*, 979 S.W.2d 30, 45 (Tex. App.–Austin 1998, pet. denied).  The law allows a plaintiff to recover front pay when a plaintiff shows that reinstatement is not feasible.  TEX. PATTERN JURY INSTRUCTIONS § 110.30, Comment, Front Pay (2003 ed.) (citing federal law); *cf. Brunnemann v. Terra Int'l Inc.*, 975 F.2d 175, 180 (5th Cir. 1992) (ADEA case).  Generally, reinstatement is the preferred equitable remedy for a discriminatory discharge.  *Julian v. City of Houston, Tex.*, 314 F.3d 721, 729 (5th Cir. 2002).  However, if reinstatement is not feasible, front-pay will be awarded if it is consistent with the remedial purposes of the law.  *Brunnemann*, 975 F.2d at 180.  "[R]einstatement is not preferred over front pay when there is no vacancy in the desired position." *Mitchell v. Sisters of Charity of Incarnate Word*, 924 F. Supp. 793 (S.D. Tex. 1996) (quoting *Shore v. Federal Express Corp.*, 777 F.2d 1155 (6th Cir. 1985)).  In other words, if reinstatement would require displacing or bumping an innocent employee from their job, then it is considered to be infeasible, and front-pay may be awarded instead of reinstatement.  *See Ray v. Iuka Special Mun. Separate Sch. Dist.*, 51 F.3d 1246, 1254 (5th Cir. 1995).

87.     In this case, front-pay, rather than reinstatement, would presumably be awarded, because the Security Advisor U.S. job has already been filled.  Regarding the calculation of front-pay, the Fifth Circuit has stated that "[f]ront pay is usually invoked when reinstatement is impracticable and is calculated from the date of judgment to age 70, or the normal retirement age, and should reflect earnings in mitigation of damages."  *Patterson*, 90 F.3d at 936 n. 8 (citing J. Hardin Marion, Legal and Equitable Remedies Under the Age Discrimination in Employment Act, 45 MD.L.REV. 298, 330–334 (1986)). *See also Blum v. Witco Chem. Corp.*, 829 F.2d 367, 374 (3d Cir. 1987) ("In calculating a front pay award, the jury must consider the expected future damages caused by defendant's wrongful conduct from the date of judgment to retirement.").

88.     Mr. Oliveri is 53-years old.  He plans to work until he is at least 70-years old, thus justifying a significant seven-figure front-pay award.  *See, e.g.*, *Jackson*, 2011 WL 2119644, at *8-9 (Fifth Circuit decision affirming five-year front-pay award in an age discrimination case); *Mota v. University of Tex. Houston Health Sci. Ctr.*, 261 F.3d 512, 527 (5th Cir. 2001) (affirming front-pay award of approximately ten years); *Donlin v. Philips Lighting North Am. Corp.*, 581 F.3d 73, 88 (3rd Cir. 2009) (holding that district court did not abuse its discretion in awarding plaintiff front-pay for ten years); *Meacham v. Knolls Atomic Power Lab.*, 381 F.3d 56, 79 (2d Cir. 2004) (affirming front-pay awards of nine to twelve and one-half years), *vacated on other grounds sub nom KAPL, Inc. v. Meacham*, 544 U.S. 957 (2005); *Gotthardt v. National R.R. Passenger Corp.*, 191 F.3d 1148 (9th Cir. 1999) (affirming an eleven-year front pay award); *Pierce v. Atchison, Topeka & Santa Fe Ry. Co.*, 65 F.3d 562, 574 (7th Cir. 1995) (holding that ten-year front-pay award did not constitute an abuse of discretion); *Hukkanen v. International Union of Operating Eng'rs, Hoisting & Portable Local No. 101*, 3 F.3d 281, 286 (8th Cir. 1993) (holding that a ten year front-pay award did not constitute an abuse of discretion).

89. <u>Liquidated Damages</u>. Claimants under the ADEA are also entitled to liquidated damages – a doubling of the back-pay award – where a violation is determined to be willful. *See Miller*, 716 F.3d at 145. "A violation of the ADEA is willful if the employer knew or showed reckless disregard for whether its conduct was prohibited by the ADEA." *Smith v. Berry Co.*, 165 F.3d 390, 395 (5th Cir. 1999) (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 128 (1985)). Shell's violation in this case was willful. *See Miller*, 716 F.3d at 145 (evidence supported jury's finding of a willful violation of the ADEA by Raytheon even though it was "undisputed that Raytheon had to undertake a reduction in force and that it instituted facially age-neutral policies and processes according to which a nondiscriminatory basis for Miller's termination could be justified."); *Palasota,* 499 F.3d at 481-82 (evidence supported finding of a willful violation of the ADEA, thus justifying award of liquidated damages); *West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 391-92 (5th Cir. 2003) (same); *Tyler v. Union Oil Co.*, 304 F.3d 379, 398-99, 401 (5th Cir. 2002) (same, and stating that "[w]e hold that the plain language of the statutes requires the interpretation that liquidated damages in an amount equal to the back pay award are mandatory upon a finding of willfulness."); *Woodhouse v. Magnolia Hosp.*, 92 F.3d 248, 256-57 (5th Cir. 1996) (same).

90. <u>Attorneys' fees</u>. Attorneys' fees are recoverable to a prevailing plaintiff under the ADEA. *See Miller*, 716 F.3d at 149 (affirming an award of attorneys' fees of $488,437.08 to the plaintiff in a single-plaintiff ADEA/TCHRA discrimination case that arose in Dallas); *Lewallen v. City of Beaumont,* 394 Fed. Appx. 38, 46 (5th Cir. 2010) (affirming an award of attorneys' fees of $428,421.75 to the plaintiff in a single-plaintiff discrimination failure to promote case); *Watkins v. Input/Output, Inc.*, 531 F. Supp. 2d 777, 789 (S.D. Tex. 2007) (awarding prevailing plaintiff in a single-plaintiff ADEA case tried in Houston $336,010.50 in attorneys' fees).

**D.    Exhaustion of Mr. Oliveri's ADEA Discrimination And Retaliation Claims**

91.    On April 24, 2017, Mr. Oliveri timely filed a Charge of Discrimination alleging age discrimination with the EEOC and the Texas Workforce Commission – Civil Rights Division ("TWC-CRD").  As of the filing of this lawsuit, sixty days have passed since Mr. Oliveri filed that Charge of Discrimination.  Accordingly, Mr. Oliveri has exhausted his administrative remedies under the ADEA.  This is so because, in order to comply with the exhaustion requirement under the ADEA, "[f]or cases arising in Texas, a complainant [simply] must file [an EEOC charge] within 300 days of the last act of discrimination" and "then wait sixty days before filing a civil action." *See Julian v. City of Houston*, 314 F.3d 721, 726 (5th Cir. 2002).  Under 29 U.S.C. § 626(d), "the claimant's independent right to sue arises automatically upon the expiration of sixty days after filing of the charge with the EEOC." *Id*. (footnote omitted).  As the Fifth Circuit explained in *Julian*:

> But there are preconditions to bringing suit under the ADEA.  Title 29 U.S.C. § 626(d) provides: "No civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been filed with the Equal Employment Opportunity Commission."  Thus, a person seeking relief under the ADEA must first file an administrative charge with the EEOC.  And § 626(d) establishes time limits for filing the EEOC charge.  For cases arising in Texas, a complainant must file within 300 days of the last act of discrimination. After timely filing the EEOC charge, the complainant must then wait sixty days before filing a civil action.  Under the plain language of § 626(d), "the claimant's independent right to sue arises automatically upon the expiration of sixty days after filing of the charge with the EEOC."  Accordingly, a complainant who timely files the EEOC charge and then observes the sixty-day waiting period has satisfied the statutory preconditions to filing suit.

*Id*. at 725-26 (footnotes omitted).

## **JURY DEMAND**

92.    Mr. Oliveri demands a jury trial.

## <u>PRAYER</u>

Mr. Oliveri asks that the court issue summons for Shell to appear and answer, and that he be awarded a judgment against Shell for the following:

a. Actual damages including but not limited to pecuniary losses, non-pecuniary losses, back-pay, and front-pay (or reinstatement);

b. Liquidated damages;

c. Prejudgment and post-judgment interest;

d. Attorneys' fees and court costs; and

e. All other relief to which Plaintiff is entitled.

Respectfully submitted,

OBERTI SULLIVAN LLP

By: s/ Mark J. Oberti
Mark J. Oberti
State Bar No. 00789951
S.D. Texas No. 17918
712 Main Street, Suite 900
Houston, TX 77002
(713) 401-3555 – Telephone
(713) 401-3547 – Facsimile
mark@osattorneys.com – Email

ATTORNEY-IN-CHARGE FOR PLAINTIFF

OF COUNSEL:

Edwin Sullivan
State Bar No. 24003024
S.D. Texas No. 24524
OBERTI SULLIVAN LLP
712 Main Street, Suite 900
Houston, TX 77002
(713) 401-3555 – Telephone
(713) 401-3547 – Facsimile
ed@osattorneys.com – Email

ATTORNEYS FOR PLAINTIFF

| DESCRIPTION OF EXHIBITS TO ORIGINAL COMPLAINT | EXHIBIT |
|---|---|
| E-mails between Crockett Oaks III and James Hall of 07/06/16 and 07/07/16 | 1 |
| E-mail chain between Crockett Oaks III, James Hall, and Dana Croft of 09/09/16 and 09/14/16 | 2 |
| E-mail chain between Crockett Oaks III and Dana Croft of 09/14/16, and other e-mails | 3 |
| Conflict of Interest Disclosure URID-000142369 submitted by Crockett Oaks | 4 |
| Job Offer Letter from Shell to Michael Oliveri of 10/03/16 and Proof of His Acceptance | 5 |
| E-mails from Crockett Oaks III to Jasper Smidtman of November 4, 7, 8, 10, 2016 | 6 |
| Crockett Oaks III's EEOC Charge of 01/27/17 | 7 |
| Michael Oliveri's EEOC Charge of 04/24/17 | 8 |
| E-mail from Shell Recruitment to Michael Oliveri of 04/27/17 | 9 |